UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION, *et al.*,  )<br>  )<br>      Plaintiffs,  )<br>  )<br>   vs.  )<br>  )<br>MIROWSKI FAMILY VENTURES, LLC,  )<br>  )<br>      Defendant.  ) | Cause No. 1:11-cv-736-WTL-DKL |

**ENTRY ON DEFENDANT'S MOTION TO DISQUALIFY COUNSEL**

This cause is before the Court on the Defendant's motion to disqualify Finnegan Henderson Farabow Garrett & Dunner as counsel to Plaintiffs/Counterclaim Defendants (docket #46).[1] The Defendant's motion is now ripe, and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I. STANDARD

Disqualification is a drastic measure courts should hesitate to impose except when absolutely necessary, because it deprives a party of the representation of their choosing. *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir.1993); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir.1982). Accordingly, motions to disqualify "should be viewed with extreme caution for they can be misused as techniques of harassment." *Id.* At the same time, this Court has "broad discretion in determining whether disqualification is required in a particular

---

[1] The Plaintiffs have filed a motion for leave to file a surreply in opposition to the Defendant's motion (docket #71). The motion is well-taken and is hereby **GRANTED**. The Plaintiffs' surreply is deemed filed as of the date of this entry.
    The Defendant has filed a motion for oral argument on the instant motion (docket #48). The motion is **DENIED**.

case." *Whiting Corp.* v. *White Mach. Corp.*, 567 F.2d 713, 715 (7th Cir. 1977). "[T]he burden is on the moving party to show the facts requiring disqualification."*Bogosian v. Bd. of Educ. of Cmty. Unit Sch. Dist. 200*, 95 F. Supp. 2d 874, 875 (N.D. Ill. 2000).

## II. FACTUAL BACKGROUND

This case concerns the technical contours of the relationship between patent owners, licensees, and their agents as they are represented before the United States Patent and Trademark Office ("PTO"). Specifically, patent owner and Defendant Mirowski Family Ventures, LLC ("MFV") argues that attorneys paid by its exclusive licensee, Plaintiffs Boston Scientific, Cardiac Pacemakers, Inc., Guidant LLC, and Guidant Sales LLC ("Guidant"), formed an attorney-client relationship with MFV when these attorneys litigated a patent reissue and a patent reexamination.

Many years ago, Dr. Mieczyslaw Mirowski invented the implantable cardioverter defibrillator ("ICD") and obtain several patents for his invention. In 1973, the Plaintiffs (through predecessor entities) acquired from Dr. Mirowski an exclusive license to several of those patents and future inventions. Pursuant to this agreement, Dr. Mirowski "retain[ed] the full right, title and interest in and to . . . future developments." However, he was obligated to promptly advise the Plaintiffs of all future developments and apply for a patent on those developments "in his own name and through patent counsel mutually agreed upon." The agreement provided that Dr. Mirowski controlled the prosecution of each patent and patent application in consultation with Guidant; however, Guidant was obligated to pay "all costs and expenses relating to the filing, prosecution, grant and maintenance of any application" for a patent on future developments. Similar terms are found in the parties' amended and restated license agreement dated January 28,

2

2004. Of relevance to this case are two patents prosecuted and patented following the 1973 agreement and pursuant to its terms.

## A. '288 Patent

The law firm of Fleit, Jacobson, Cohn & Price ("Fleit Jacobson") prosecuted the application of U.S. Patent No. 4,407,288 (the "'288 patent"). Martin Fleit, an attorney with Fleit Jacobson, testified that he prosecuted the application, which led to issuance of the '288 patent on October 4, 1983.

On October 26, 1998, in conjunction with litigation concerning the '288 patent, a competitor filed a request for reexamination of the '288 patent. At that time, the '288 patent was owned by Anna Mirowksi, the widow of Dr. Mirowski, and exclusively licensed to Plaintiff Guidant. Attorney Fleit performed some initial work on the reexamination. During this time, Guidant retained the law firm of Finnegan, Henderson, Farabow, Garrett & Dunner ("Finnegan") to serve as counsel during the reexamination. On September 27, 1999, Mirowski family general counsel Sidney Silver instructed Fleit that Finnegan lawyers J. Michael Jakes and Kara F. Stoll had been selected to prosecute the ongoing reexamination of the '288 patent. Fleit then granted powers of attorney on behalf of Anna Mirowski to Jakes and Stoll to serve as "associate attorneys" during the reexamination proceedings. The power of attorney directed that all future correspondence should be sent to Finnegan.

After filing the power of attorney, Jakes corresponded regularly with the PTO on behalf of the "Patent Owner," Anna Mirowski. From October 1999 through May 4, 2000, when the reexamination process was completed, Jakes defended the validity of the existing '288 claims and drafted and proposed new claims. Jakes made representations that he represented the "Patent

3

Owner," for example: "Patent Owner recently hired new counsel to prosecute the patent in this reexamination proceeding, as evidenced by the Associate Power of Attorney filed concurrently with this request [appointing Jakes]." Jakes and Stoll repeatedly corresponded with the PTO on behalf of the "Patent Owner." Jakes and Stoll also appeared for an interview with the PTO patent examiner on November 9, 1999, as the "owner's representative."

### B. '119 Patent

Another of Dr. Mirowski's patents, U.S. Patent No. 4,928,688, was originally prosecuted by Fleit Jacobson and the law firm of Haugen & Nikolai. On May 29, 1992, a request for reissue of the patent application was filed. As with the '288 reexamination proceedings, Guidant retained Finnegan to serve as counsel during the reissue proceedings in September 2000. One year later, in September 2001, right and title to the patents was transferred by Anna Mirowski to Mirowski Family Ventures, LLC ("MFV"). On October 18, 2001, Silver again directed Fleit to grant powers of attorney on behalf of MFV to Jakes and Stoll to serve as "associate attorneys" during the reissue proceedings. The power of attorney also directed that all future correspondence should be sent to Finnegan. This patent was ultimately reissued as RE38,119 (the "'119 patent") on May 20, 2003.

### C. Finnegan Attorneys' Relationship with the Parties

Attorney Martin Fleit testified that, during his work related to the '119 and '288 patents, it was "always crystal clear" that he represented and maintained an attorney-client relationship with Dr. Mirowksi, Anna Mirowski, and/or MFV. Fleit explained that, while expenses associated with the prosecution of '119 and '288 patents were paid by the licensee according to the license agreement and "licensees were cooperated with to the greatest extent possible," his client was

4

Dr. Mirowski, Anna Mirowski, or MFV. During work on the '288 and '119 patents, Fleit was never given the authority to act on behalf of the licensee. According to Fleit, the powers of attorney he executed enabled the Finnegan lawyers to "step into his shoes" and act directly on behalf of the patent owner at the time. Fleit also believed that his communications with Finnegan lawyers would be entitled to all the rights and protections afforded by the relationship created by the powers of attorney and by the attorney-client relationship that each held with the respective patent owners. Neither Jakes nor Stoll ever advised Fleit that Finnegan attorneys did not represent the patent owners. Similarly, Silver testified that he believed that Finnegan attorneys represented Mirowski and the Plaintiffs when it prosecuted the patents at issue. He also testified that he considered Kara Stoll the attorney for Mirowski for the purposes of patent prosecution.

During the '288 reexamination and the '119 reissue proceedings, Finnegan attorneys took instructions from Guidant, received payment from Guidant, and had communications with Guidant that were not sent to Mirowski. All of Finnegan's billing entries indicate that their client was "Cardiac Pacemakers," a subsidiary of Guidant. Stoll testified that she did not recall any officer or representative from MFV or its predecessors-in-interest attempting to give Finnegan attorneys instruction on how to handle those matters. Similarly, Finnegan attorneys did not solicit instructions from Mirowski on those matters. While Finnegan attorneys understood that Guidant and Mirowski had an identity of interests in the PTO, they believed that Guidant, not Mirowski, was their client.

### III. DISCUSSION

The Defendant argues that Finnegan attorneys have a conflict of interest and must be disqualified. The Indiana Rules of Professional Conduct and the Seventh Circuit Standards of

Professional Conduct govern the conduct of those practicing before this Court. S.D. Ind. L.R. 85-3(e). Under the Indiana Rules, "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Ind. R. Prof'l Cond. 1.9(a). According to the Defendant, Finnegan attorneys must be disqualified not only because it previously represented the Defendant on a substantially related matter, but also because, even if there is no prior relationship, the appearance of impropriety created by Finnegan's representation of the Plaintiffs requires disqualification. The Court addresses each argument below.

### A. Substantial Relationship Test

When determining whether an attorney has a conflict of interest with a former client, the court must determine whether a substantial relationship exists between the subject matter of the prior and present representations. This so-called "substantial relationship" test has three steps: (1) the judge must make a factual reconstruction of the scope of the prior legal representation; (2) it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters;[2] and

---

[2] While the Defendant asserts that the entire inquiry into conflicts of interest must be resolved in favor of lingering doubt, only the inquiry into whether the presumption that confidential information was shared was sufficiently rebutted requires the resolution of doubts in favor of disqualification. *LaSalle Nat'l Bank v. Lake Co.*, 703 F.2d 252, 255-56 (7th Cir. 1983) ("Having concluded . . . that a substantial relationship existed between the subjects of the past and present representation, we are entitled to presume that confidential information was received during the prior representation, but must still decide whether that presumption has been rebutted on the facts of this case. . . . A very strict standard of proof must be applied to the rebuttal of this presumption, however; and any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification.").

(3) it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client. *LaSalle Nat'l Bank v. Lake Co.*, 703 F.2d 252, 255-56 (7th Cir. 1983).

Step one of the test – reconstruction of the scope of the prior legal representation – presupposes the existence of a representation, but it goes without saying that the Court can not reconstruct the scope of the prior representation where no attorney-client relationship existed. *Cf. Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336 (Fed. Cir. 1988); *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991) (explaining that, in an attorney malpractice action, the "plaintiff must first prove the existence of an attorney-client relationship"). While the existence of an attorney-client relationship is often clear and undisputed, it is not so here. The Court thus turns to this analysis first.

Under Indiana law,[3] "[a]n attorney-client relationship need not be express, but may be implied by the conduct of the parties." *Matter of Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995). "Attorney-client relationships have been implied where a person seeks advice or assistance from

---

[3] The Plaintiffs argue that Federal Circuit law applies, while the Defendant argues that District of Columbia law applies. Neither is correct; Indiana law governs. Even if an appeal of this Court's decision were properly reviewed by the Federal Circuit, "procedural matters that are not unique to patent issues will be reviewed under the law of the regional circuit court where appeals from the district court would normally lie." *Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1566 (Fed. Cir. 1985) (applying Ninth Circuit law to district court orders disqualifying attorneys). Thus, whether reviewed by the Federal or Seventh Circuit, the reviewing court will apply Seventh Circuit law. This Court governs the conduct of counsel before it through the Indiana Rules of Professional Conduct, and an attorney appearing before this Court could be disqualified if his representation of a client would run afoul of those rules as interpreted under Indiana law. Whether Finnegan attorneys and the Defendant formed an attorney-client relationship under District of Columbia law is irrelevant to the question of whether Finnegan attorneys' representation of the Plaintiffs before this Court would run afoul of the law regarding conflicts of interest as it stands in Indiana.

an attorney, where the advice sought pertains to matters within the attorney's professional competence, and where the attorney gives the desired advice or assistance." *Id.* "An important factor is the putative client's subjective belief that he is consulting a lawyer in his professional capacity and on his intent to seek professional advice." *Id.* However, "[t]he relationship is consensual, existing only after both attorney and client have consented to its formation." *Hacker*, 570 N.E.2d at 955. As a result, a "would-be client's unilateral belief cannot create an attorney-client relationship." *Id.*

The Defendant argues that Finnegan had an attorney-client relationship with both the Plaintiffs and Anna Mirowski as executor of Dr. Mirowski's estate with respect to the '288 patent and with MFV with respect to the '119 patent, while the Plaintiffs argue that no attorney-client relationship existed with respect to either party. According to the Defendant, Finnegan's attorney-client relationship with Mirowski and MFV can be derived from the powers of attorney Fleit executed, Stoll's testimony in two depositions, and Mirowksi and MFV's expectations. The Court disagrees; the evidence the Defendant puts forth is insufficient to establish an attorney-client relationship.

While the Defendant initially argues that the "powers of attorney created an attorney-client relationship between Finnegan and the patent owner," it argues in its reply brief that the powers of attorney are "evidence of, not the sole basis for, the existence of an attorney-client relationship." This concession appears prudent in the light of the cases cited by the Plaintiffs holding that a power of attorney does not ipso facto create an attorney-client relationship. *E.g., Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557 (Fed Cir. 1985); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876 (E.D. Penn. 1976). Yet the Defendant is correct that nothing

in the cases cited by the Plaintiffs suggests that a power of attorney cannot be evidence of an attorney-client relationship. The language of the parties' 1973 and 2004 licensing agreements certainly contemplates a relationship that could qualify, as it provides that the licensor "controls" patent prosecution, which prosecution is effected by attorneys paid by the licensee. One imagines that the party controlling the prosecution would interact with the attorneys prosecuting the patent at a level indicative of an attorney-client relationship.[4] However, whether such a relationship *could* have been formed, and whether it was, are two different questions, and only the answer to the latter is dispositive here. Accordingly, the Court turns to the other evidence the Defendant argues establishes an attorney-client relationship.

According to the Defendants, Finnegan's representations to the PTO that it represented the "patent owner," Finnegan's submission of claims to the PTO on behalf of the Defendant, Finnegan's appearance at a PTO interview as "owner's representative," and Finnegan attorney Stoll's deposition testimony that Finnegan represented the "patent owner" establish an attorney-client relationship. However, each of these facts is simply a product of the technical relationship created between Finnegan and the Defendant by virtue of the execution of powers of attorney. The patent owner or his agent, not a licensee or a licensee's agent, may apply for reissuance of a patent, 35 U.S.C. § 251, and the patent owner or his agent, not the licensee or the licensee's agent, may participate in the reexamination proceedings, 35 U.S.C. § 304 ("The patent owner will be given a reasonable period . . . within which he may file a statement on [the new question

---

[4] The Plaintiffs argue that the section of the licensing agreement regarding control over patent prosecutions is not applicable here because the reexamination proceeding is "an adjunct to the defense of an infringement proceeding," and thus falls under the section of the licensing agreement providing that the licensee controls infringement proceedings. If that is the case, there is an even stronger argument that no attorney-client relationship ever arose.

of patentability]").[5] Thus, to authorize the attorneys to participate in the proceedings, the Defendant was required to grant powers of attorney to Finnegan attorneys and the Finnegan attorneys were in turn entitled to assert that they represented the patent owners. As a result, when attorney Stoll testified that Finnegan "represented" MFV "as the patent owners," she was merely accurately describing the technical relationship created by the execution of the power of attorney. Similarly, when Finnegan attorneys asserted claims on behalf of the "Patent Owners," they was doing the same. However, as explained above, the existence of this technical relationship is not enough to establish an attorney-client relationship by itself.

Apart from evidence derived from the powers of attorney, the Defendant presents little evidence to support its contention that it had an attorney-client relationship with Finnegan. In fact, the only other evidence the Defendant offers is the deposition testimony of Sidney Silver, Mirowski family counsel, that "there was no question" he considered Attorney Stoll to be MFV's attorney for purposes of the patent prosecution.[6] While this statement offers at least *some* evidence of the would-be client's intent to form an attorney-client relationship, there is no evidence whatsoever of Finnegan's intent to form an attorney-client relationship with Anna Mirowski or MFV. The Defendant's argument thus falls far short of establishing the consensual

---

[5] The Defendant acknowledges as much: "If, as Finnegan now contends, it was allegedly *not* representing Mirowski at that time, it lacked standing to prosecute the '288 reexamination and acted improperly." Def.'s Reply in Supp. of Def.'s Mot. to Disqualify Finnegan 15, Feb. 9, 2012, ECF No. 69.

[6] The Defendant argues that Fleit's testimony as to his understanding of his relationship with Dr. Mirowski, Anna Mirowski, and MFV also serves as evidence supporting the existence of an attorney-client relationship between Finnegan and the Defendant. However, this evidence speaks to the wrong relationship, as the Defendant itself recognizes: "The issue is who Finnegan was representing, not who Mr. Fleit was representing." Def.'s Reply in Supp. of Def.'s Mot. to Disqualify Finnegan 6, Feb. 9, 2012, ECF No. 69.

relationship between the parties that Indiana law requires. Furthermore, the Defendant is silent on a number of factors that could bear on the analysis, including evidence one would expect to find when the licensor "controls" the patent prosecution, such as the nature of Finnegan's communications and interactions with Anna Mirowski or MFV, including whether Anna Mirowski or MFV assumed these communications were confidential. *See Layne Christensen Co. v. Purolite Co.*, 2011 WL 1113543 at *8 (D. Kan. 2011). The Defendant is similarly silent on other factors, likely because they weigh against an attorney client-relationship, such as the fact that Finnegan was selected as counsel by Guidant, Guidant paid all of Finnegan's bills, Guidant and Finnegan exchanged communications that were not shared with Mirowski or MFV, and Finnegan neither received nor solicited instructions from Mirowski or MFV about how to handle the prosecution. While Finnegan may have technically represented the Defendant before the PTO, this relationship does not qualify as an attorney-client relationship and thus is not a "prior relationship" under the substantial relationship test. Because no prior relationship existed, Finnegan's continued representation of the Plaintiffs will not run afoul of Indiana 1.9(a) and disqualification is not warranted.

### B. Appearance of Impropriety

The Defendant argues in the alternative that, even if no attorney-client relationship existed between Finnegan and Mirowski or MFV, the Court must disqualify Finnegan to protect "the integrity of the adversarial process." According to the Defendant, in the instant case Finnegan will question the validity of patents it previously represented during reexamination and reissue proceedings, and this it may not do.

It is true that permitting a law firm to later question the validity of patents it helped prosecute would cast a shadow over the integrity of the patent prosecution system. *Sun Studs*, 772 F.2d at 1567 ("We do not believe any court would hold that it is within the bounds of propriety to permit a law firm to assist a client in obtaining a patent which was equitably owned by another and then to lead the attack against the patent's validity once it is transferred to its rightful owner."); *Monon Corp. v. Wabash Nat'l Corp.*, 764 F. Supp. 1320, 1323 (N.D. Ind. 1991) ("Now the same lawyer [who drafted the patent application] goes so far as to claim that the same invention lacks the conditions of patentability. No matter who the clients were or are; no what confidential information is possessed by whom, this simple circumstance gives 'an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the law public – or for that matter the bench and bar.") (citing *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1269 (7th Cir. 1983). *But see Telectronics*, 836 F.2d 1332 ("[A]ttorneys represent *clients*- not legal positions or patents. . . . Telectronics does concede that it would be unusual to have counsel impeaching their own work product. But that is not this case."). However, the Plaintiffs do not contest the validity of the patents; rather, the Plaintiffs assert only that "claim 4 of the '288 patent is invalid to the extent MFV disregards the Federal Circuit's clear holding on the scope of claim 4, i.e., that 'infringement can only occur in cases in which the patented method [of delivering cardioversion therapy] is practiced.'" In other words, the Plaintiffs may question the meaning and import of Federal Circuit's interpretation of the scope of the patent, but will not

contest the validity of the patent itself. Because Finnegan does not seek to invalidate the patents, no appearance of impropriety arises.[7]

### C. Attorney Testimony

Finally, the Defendant seeks to disqualify Finnegan on the basis that the Plaintiffs have not agreed that they will not call any current Finnegan attorney as a witness. "The advocate-witness rule, which articulates the professional impropriety of assuming the dual role of advocate and witness in a single proceeding, has deep roots in American law. That counsel should avoid appearing both as advocate and witness except under special circumstances is beyond question." *United States v. Ewing*, 979 F.2d 1234, 1236 (7th Cir. 1992) (citations omitted). However, the Defendant has not shown that a Finnegan attorney will actually testify as a witness, and for this reason disqualification is not warranted. Furthermore, if either party later indicates its intent to call a Finnegan attorney as a witness, the Court has other means of addressing the potential professional impropriety. *See, e.g.*, *Harter v. Univ. of Indianapolis*, 5 F. Supp. 2d 657, 667 & n.4 (S.D. Ind. 1998).

### IV. CONCLUSION

For the foregoing reasons, the Defendant's motion to disqualify counsel is **DENIED**.

SO ORDERED:  06/01/2012

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

---

[7] The Defendant also suggests that the appearance of impropriety arises because Finnegan will be questioning the "value" and "worth" of the patents. While it may be true that claims made during reissue and reexamination proceedings affect the value and worth of a patent, the Defendant has not shown that Finnegan ever made any representations as to the value and worth of the patents when it litigated the reexamination and reissue proceedings. The Defendant has therefore not shown that Finnegan will somehow contradict its prior work.

Copies to all counsel of record via electronic communication